**Robert B. NEWTON, et al., Plaintiffs,**

v.

**John N. VAN OTTERLOO, et al., Defendants.**

No. S89–610.

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 11, 1991.

Ian D. Lanoff, Jeffrey Freund, John M. West, Washington, D.C., Allan J. Mindel, Merrillville, Ind., for plaintiffs.

Timothy W. Woods, South Bend, Ind., for defendants John K. Van Otterloo, James A. Carr, Maurice Gallaher, Kenneth P. Fedder, Gary C. Belting, Gerald F. Vogel, Arlene L. Heim, South Bend Lathe, Inc., South Bend Lathe, Inc. Employee Stock Ownership Plan and Donald E. Neuerburg.

James H. Ham, III, Douglas D. Powers, Fort Wayne, Ind., John Purcell, Indianapolis, Ind., for defendant First Source Bank.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause is before the court on three motions for summary judgment pursuant to Fed.R.Civ.P. 56. All parties appear to agree that no genuine issue of material fact exists in this unusual case under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.*, and the court has identified no material fact issues. It remains to determine which parties are entitled to judgment as a matter of law. The court has jurisdiction pursuant to 29 U.S.C. § 1132(e)(1).

### I. History

The South Bend Lathe Employee Stock Ownership Plan ("ESOP") was created in 1975 when the Industrial Revolving Fund ("the Fund") made a $5,013,500.00 loan to the ESOP to enable South Bend Lathe employees to purchase all the capital stock of what had been the South Bend Lathe Division of Amsted Industries and prevent the plant's closing. The parties agree that the ESOP is an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2) and is subject to ERISA pursuant to 29 U.S.C. § 1003(a). South Bend Lathe, Inc.

("SBL") was created as a result of this transaction.

The ESOP Committee holds the stock in trust for the SBL employees, and the stock serves as collateral for the Fund loan. SBL agreed to make annual cash contributions to the ESOP so the ESOP could make its loan payments to the Fund. When the ESOP makes a loan payment, it redeems the shares that serve as collateral and allocates them to individual employees' accounts. The ESOP's holdings consist almost entirely of SBL stock. In November, 1989, the ESOP held eighty-one percent of SBL's outstanding stock, defendant John Van Otterloo owned eighteen percent, and eleven other individuals owned the remaining one percent.

The plaintiffs are four present or former hourly SBL employees. The defendants consist of SBL management, some of whom serve on the ESOP Committee, and the ESOP's voting trustee. The amended complaint consists of a surfeit of alleged ERISA violations loosely organized into thirteen counts. Most defendants have responded with a principal argument that seems to say that this case is truly a labor-management dispute wearing ERISA clothing and suggesting that the plaintiffs are trying to wedge a square peg into a round hole. The plaintiffs respond with intemperate language.* While the plaintiffs make numerous arguments in support of the various claimed ERISA violations, the case revolves around three transactions:

1. In the 1989 SBL shareholder election, the Committee chose not to solicit proxies from former SBL employees and denied proxies to at least two plaintiffs who requested proxies. The Committee then abstained from voting the majority of the ESOP-held SBL shares, allowing retention of the management slate and the passage of a provision staggering the terms of SBL directors.

2. SBL decided not to make its annual payment to the ESOP, rendering the ESOP unable to make its loan repayment installment to the Fund. The failure to make that installment resulted in litigation, since settled on terms supposedly favorable to the ESOP, brought against the ESOP by the Fund.

3. SBL directors removed plaintiff Robert Newton from the Committee as a result of his filing of this lawsuit.

Additional facts are set forth as necessary to explain and discuss these three claims.

## II. Decisions Concerning the 1989 Shareholders' Meeting

From 1975 to 1989, the Committee consisted exclusively of SBL employees; SBL management comprised a Committee majority for most of those years. The Committee's membership has changed since the events at issue here, but in 1989, the Committee consisted of five members: Robert Newton and Richard Stanton were hourly SBL employees; Gary Belting was SBL's Chief Financial Officer; Gerald Vogel was its Personnel Manager; Arlene Heim was Mr. Vogel's secretary. Mr. Newton and Mr. Stanton are plaintiffs here. Mr. Belting, Mr. Vogel, and Mrs. Heim are among the defendants.

After a discussion at some unstated time with SBL's then-president and chief executive officer, John Van Otterloo, Mr. Belting decided that the Committee would not solicit proxies from SBL retirees, believing that the ESOP documents did not require such solicitation. In 1988, Mr. Van Otterloo had recommended that the Committee direct its voting trustee to abstain from voting the ESOP's unallocated shares, as well as shares that were not voted by individual participants. The Committee fol-

---

* For example, in footnote 2 of the plaintiffs' reply memorandum, they charge, "Defendants apparently have concluded that no one will notice when they say things that simply are not true," and suggest that the court look with a jaded eye toward all of the defendants' assertions. Casting aspersions at opposing counsel earns no credit with this court and disserves the clients'

interest. The quoted language springs from the defendants' characterization of the plaintiffs' case. If counsel believes an adversary has signed a paper without reasonable inquiry into fact and law, proper remedies exist. If no such belief is held, it is adequate simply to correct any misapprehension without impugning opposing counsel.

lowed this course of action in 1989, and defendant 1st Source Bank, then the ESOP's voting trustee, voted as directed at the shareholder meeting that considered the election of a slate of directors and a proposal to change the directors' tenure to staggered terms.

As a result, 15,500 ESOP-held shares—nearly seventy percent of the plan's holdings—were not voted in 1989. The voting ESOP participants cast 5,100 shares against, and 1,900 shares for, the management slate. On the strength of Mr. Van Otterloo's vote of his own 5,000 shares, he was reelected to the SBL Board of Directors, along with defendants James Carr and Maurice Gallaher, and SBL's Articles of Incorporation were amended to provide staggered three-year terms for directors.

The plaintiffs allege that the Committee and Mr. Van Otterloo manipulated the voting of these shares to retain incumbent management, that the SBL Board of Directors imposed their will on the Committee as to how the committee should vote its shares, and that 1st Source, as voting trustee, followed the Committee's instructions in voting the Plan shares, knowing this was not in the ESOP participants' best interest.

The plaintiffs claim that the Committee and Mr. Van Otterloo breached their fiduciary duties by failing to act solely in the ESOP participants' interest as required by 29 U.S.C. § 1104(a). It was upon Mr. Van Otterloo's suggestion or direction that proxies were not sent to retirees, the plaintiffs contend, although retirees had received proxies in past elections. It was upon Mr. Van Otterloo's recommendation that three Committee members voted to abstain the unallocated and unvoted shares, although they had not done so in the past. The plaintiffs contend that the Committee defendants were interested in preserving their management level jobs and, thus, had a conflict of interest that prevented them from acting with the level of care and loyalty that ERISA demands.

Eight counts of the amended complaint relate to the decisions concerning the 1989 shareholders' meeting. The claims may be grouped by the overlapping categories of defendants. Accordingly, the court first considers, in Part II-A, the claims against the defendant Committee members (Mr. Belting, Mr. Vogel, and Mrs. Heim); then, in Part II-B, the claims against Mr. Van Otterloo for his individual actions; in Part II-C, the claims against the SBL Board of Directors (Mr. Van Otterloo, James Carr, Maurice Gallaher, and Kenneth Fedder); and finally, in Part II-D, the claim against the ESOP's voting trustee, 1st Source Bank.

### A. The Committee Defendants

Five counts of the plaintiffs' amended complaint address the Committee defendants' decisions with respect to the voting at the 1989 shareholders' meeting:

Count I alleges that the Committee defendants breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A), (B), and (D) by deciding to abstain from voting the ESOP's shares;

Count II alleges that the Committee defendants breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A), (B), and (D) by their decision not to solicit proxies from ESOP participants with allocated, vested shares;

Count III alleges that the Committee defendants violated IND.CODE 23-1-30-2 by failing to provide notice of the 1989 shareholders' meeting to certain former employees;

Count IX alleges that the Committee defendants breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A), (B), and (D) by engaging in a course of conduct intended to consolidate the positions of Mr. Van Otterloo and his allies; and

Count X alleges, among other things, that the Committee defendants violated 29 U.S.C. § 1106(a)(1)(D) by using plan assets for the benefit of parties in interest through their decisions with respect to the shareholders' meeting.

### 1. Discretion as to Solicitation of Proxies

According to § 8 of the Plan document, the trustee shall vote stock held in trust

only in accordance with instructions from the Committee, which must solicit voting instructions from participants whose shares are vested. The Committee may determine how to instruct the trustee to vote shares as to which the Committee has not received the participant's instruction. The last sentence of § 8 provides: "The solicitation of voting instructions from Participants by the Committee shall be required only with respect to Participants who are Employees of the Company as of the record date for voting at a shareholder meeting."

The plaintiffs claim that 29 U.S.C. § 1002(7) makes "participants" of employees and former employees alike, and that under ERISA former employees cannot be denied voting rights regardless of the language of the plan document. The Committee defendants rely on the plan document's language defining a "participant" as an employee, §§ 2 and 3.

■ The court cannot agree with the plaintiffs that all ESOP members had a right to be solicited to vote in the shareholder meeting. It is true, as the plaintiffs note, that ERISA defines "participant" as:

> ... any employee or former employee, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members or such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7). But to say that all SBL retirees are participants in the ESOP is not to say that all must be solicited to vote. While a plan cannot define "participant" inconsistently with ERISA for purposes of rights created by ERISA, *see Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985), nothing in ERISA vests participants with the right to be solicited for proxies in a shareholder election. Neither ERISA nor the Committee's customs or traditions required the Committee to solicit proxies from all participants.

■ Conceding that no case so holds, the plaintiffs contend that soliciting some participants for proxies while ignoring others constitutes discrimination inconsistent with the fiduciary obligation created by 29 U.S.C. § 1104(a)(1). The court disagrees. Although § 1104(a)(1) prohibits fiduciaries from discriminating against plan participants in matters related to plan benefits, *Winpisinger v. Aurora Corp.*, 456 F.Supp. 559, 566 (N.D.Ohio 1978), it does not prohibit ERISA plans from granting discretion to determine which plan participants will be solicited for voting proxies in a shareholder election conducted by a corporation in which the plan holds shares.

■ The plaintiffs also argue that state law vested them with a right to vote at the shareholders meeting. IND.CODE 23-1-30-2. If that right were violated at the 1989 shareholder meeting, SBL would be liable; the statute affords no right of action against an entity that holds a share in trust for another.

Accordingly, § 8 of the SBL Plan document does not violate ERISA to the extent it affords the Committee discretion in determining which participants will be solicited for proxies. This conclusion does not foreclose the plaintiffs' claims, however; the exercise of that discretion remains to be considered.

*2. Discretion to Direct Abstention*

The plaintiffs contend that the Committee had no discretion to direct the abstention of unallocated, unvoted shares. They claim that if the Committee had discretion not to send proxies to non-employees, the discretion was abused because the Committee's purpose was to entrench incumbent management, not to further the ESOP participants' interests.

The Committee defendants argue that § 8 of the plan documents gives the Committee discretion to direct voting of unallocated and unvoted shares. They acknowledge their desire to see Mr. Van Otterloo and the other incumbent managers continue to head the company, but insist that the incumbent managers' retention was in the

ESOP participants' best interest, because it would enable SBL to make a financial turnaround and raise the value of SBL stock. Had they not directed abstention, they would, in their discretion, have voted the shares in favor of the management slate, especially because the union opposition had no slate of its own or an alternative business plan to offer.

The Committee defendants contend that this action is truly a part of the union's vendetta against Mr. Van Otterloo and that the union would prefer that SBL collapse than rather continue with him at its head. They further argue that while the ESOP participants' interests coincide with those of SBL management, the union's interests do not because the union favored short term retention of as many jobs as possible. The ESOP beneficiaries' interest was in keeping SBL a going concern in the long run and keeping the value of stock high. This, they argue, would serve the interests of all ESOP participants and beneficiaries, including present and former employees in both labor and management positions, and not just the interests of shop employees. A fiduciary must consider the best interest of the plan participants, not only the employees' immediate interest in retaining jobs.

■ The plaintiffs have not persuaded the court that anything would forbid instructing the shares' abstention under appropriate circumstances. Even assuming the committee members had a fiduciary duty to decide what to do with the ESOP assets—the right to vote the shares—under the circumstances of this case, they plainly made such a choice. Given Mr. Van Otterloo's right to vote his own 5,000 shares, abstention was tantamount to voting for the management slate and staggered term proposal. As discussed below, the decision to produce that result may have resulted from a breach of fiduciary duty, but the decision to abstain rather than vote was not, standing alone, such a breach.

The Committee was not required to vote the ESOP's shares in proportion to the proxy returns. The plaintiffs disavow any claim that the Committee was required to

do so, and it is clear that proportional voting was not required; indeed, such a method of casting the votes itself would constitute a breach of the Committee members' fiduciary duties. *Danaher Corp. v. Chicago Pneumatic Tool Co.*, 635 F.Supp. 246, 249 (S.D.N.Y.1986) ("it would be inappropriate (and perhaps a breach of fiduciary obligation) for a trustee to put aside his personal judgment in favor of carrying out the wishes of the CP plan participants").

### 3. Fiduciary Exercise of Discretion

The plaintiffs contend that the manner in which the Committee defendants exercised their discretion concerning solicitation and voting violated their fiduciary obligations under ERISA. They rely on *Leigh v. Engle*, 727 F.2d 113 (7th Cir.1984), and its three-pronged approach for determining whether a plan fiduciary has violated the duty of loyalty. The court must ask:

> (1) whether the conflict of interests is so great that it is virtually impossible for the fiduciary to discharge the duties with an eye single to the beneficiaries' interests, and

> (2) if not, whether the fiduciary engaged in an intensive and independent investigation of options to ensure that the action taken was in the beneficiaries' best interest, and

> (3) the extent to which the use of the trust's assets tracked the best interest of another party.

*Leigh* involved a trust fiduciary's use of trust assets to invest in companies in which the fiduciary had interests. The plaintiffs argue that the trust assets in this case are the votes of the ESOP-held shares and that *Leigh*'s reasoning applies. The plaintiffs contend that the Committee failed on each of the *Leigh* prongs: the committee members' conflict of interest springs from their employment positions; they undertook no intensive and independent investigation of their options; and their votes tracked the interests of the SBL Board.

#### a. Applicability of Leigh v. Engle

■ It must first be determined whether this case is one to which the *Leigh* test

applies. *Leigh* involved a decision by various fiduciaries to use plan assets for their own purposes: to build up their ownership interests in entities they sought to acquire. As matters developed, the decisions also benefitted the plan participants because the investments worked out very nicely. ERISA, however, forbids a fiduciary to consider his own interests in making decisions respecting the assets of an ERISA plan; the fiduciary's decisions "must be made with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2nd Cir.1982). None of the defendants in this case are claimed to have engaged in financial self-dealing.

In *O'Neill v. Davis*, 721 F.Supp. 1013 (N.D.Ill.1989), the plaintiffs, as here, contended that the trustees of an employee stock ownership trust had voted the trust's shares of company stock to reconstitute the company's board of directors and to consolidate their control of the company. The court held that the complaint stated a claim for which relief could be granted under ERISA. The right to vote than plan's shares, the court held, constituted an "asset" of the plan and determination of how to exercise that vote amounted to management of the plan's assets, producing an ERISA-based fiduciary obligation to make that decision solely in the interest of the plan's participants and beneficiaries, rather than in the interest of one set of contestants for company control. 721 F.Supp. at 1015 ("[T]he statute's use of the term 'management' cannot logically be limited to the 'investment' of Plan assets.").

■ The court concurs with the *O'Neill* court's reasoning. That reasoning, in turn, compels the conclusion that the *Leigh* analysis governs the Committee's decisions on voting the Plan's shares in SBL. The Committee made decisions on how plan assets—the right to vote the SBL shares— were to be managed: who among the participants would be allowed to vote, and how the remaining shares would be voted. Accordingly, 29 U.S.C. § 1104(a) imposed upon those making such decisions a fiduciary obligation to discharge their duties "solely in the interest of the participants and beneficiaries".

#### b. Application of *Leigh v. Engle*

■ The court cannot agree with the plaintiffs that the Committee defendants' conflict of interests, as officers of SBL and ESOP fiduciaries, was so great that it was virtually impossible for the fiduciaries to discharge their duties with an eye single to the beneficiaries' interests, in violation of the first test of *Leigh v. Engle.* Congress recognized that ERISA plans may be well-served by persons with intimate knowledge of other parties in interest; 29 U.S.C. § 1108(c)(3) specifically permits an officer or employee of a party in interest to serve as a fiduciary. *See also De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191–1192 (4th Cir. 1989).

■ Nonetheless, the court agrees with the plaintiffs that under the second test of *Leigh v. Engle*, the Committee defendants violated their fiduciary duty under ERISA. As appointees of the management slate that was the subject of the shareholder vote, the Committee defendants had, at best, divided loyalties with respect to decisions on how to vote the ESOP's shares. In cases to which the *Leigh* test applies, "Where it might be possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh v. Engle*, 727 F.2d at 125–126.

It might be argued that this case differs from *Leigh*, at least with respect to the solicitation decision, because of § 8 of the plan documents. The Committee simply decided to do what the plan document expressly authorized it to do: refrain from soliciting proxies from retirees. Nothing in *Leigh* supports distinguishing its rule on that ground, however; the *Leigh* court did not suggest that the plan document can alter the fiduciary obligation created by ERISA. The defendants in *Leigh* had ample discretion to make the challenged investments, but their fiduciary obligations required them to take additional steps in

light of their conflicting interests. Similarly, the plan document specifically provided the Committee defendants with discretion to decide whether to solicit proxies from retirees, but ERISA demanded that they make that decision "solely in the interest of the participants and beneficiaries".

But this, protest the defendant Committee members, is precisely what was done. Just as Charles Erwin Wilson believed that what's good for General Motors was good for the country, the defendant Committee members say that what was good for SBL was good for the ESOP. That claim is plausible and has force with respect to another of the plaintiffs' claims. SBL stock is nearly all the ESOP owns, and no alternative slate was presented at the 1989 shareholder meeting. A successful vote against the management slate would have produced corporate chaos, diluting (if not bankrupting) the value of SBL shares and, hence, the ESOP. But the quasi-self-dealing involved in *Leigh v. Engle* also benefitted the pension plan, and the *Leigh* court noted that, "Good faith is not a defense to an ERISA fiduciary's breach of the duty of loyalty." *Leigh v. Engle*, 727 F.2d at 124.

Three members of the Committee—Mr. Belting, Mr. Vogel and Mrs. Heim—must be deemed to have had divided loyalties on the matter of the continuation of the management slate. As SBL's chief financial officer and personnel manager, Mr. Belting and Mr. Vogel answered to Chief Executive Officer Van Otterloo, and Mrs. Heim, in turn, answered to Mr. Vogel, in their capacities as salaried SBL employees; it was Mr. Van Otterloo's continued employment as CEO upon which they were voting.

Their divided loyalties were pertinent to the reasons for their decisions, particularly the solicitation decision. Mr. Belting testified in his deposition that he favored the decision because the tendency of non-employees would be to vote against the present management, placing the company "in shambles", and discussed those concerns with Mr. Vogel and Mrs. Heim. Mr. Vogel testified that he favored the decision because retirees might assist what he

deemed to be an unprincipled effort to get rid of the president and the Board.

The existence of such divided loyalties compelled their adherence to a heightened standard of care, *Teamsters Local No. 145 v. Kuba*, 631 F.Supp. 1063, 1071 (D.Conn. 1986), a standard met only by engaging in "an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh v. Engle*, 727 F.2d at 125–126. The record indicates that none of three committee members who were salaried SBL management engaged in such an investigation.

The defendants suggest that Mr. Newton, vice president of his local of the United Steelworkers of America, who sought and obtained nothing more than the advice of his union and his girl friend in making the decisions in which he engaged, may not have complied with his fiduciary obligation under *Leigh*, either. While this may be true, the defendants have cited no authority for the proposition that Mr. Newton's arguably unclean hands lessened the fiduciary obligations of the remaining Committee members.

### 4. Conclusion

Because the Committee defendants did not engage in the sort of inquiry required of them for decisions in which their loyalties were divided—a spectrum of decisions that includes who would be permitted to vote at the shareholders meeting and how the ESOP shares would or would not be voted at that meeting—the plaintiffs are entitled to judgment as a matter of law against those defendants as a result of those decisions. This holding that Mr. Belting, Mr. Vogel, and Mrs. Heim violated 29 U.S.C. § 1104(a) renders it unnecessary to determine whether they also violated § 1106(a) and (b).

Accordingly, the plaintiffs are entitled to judgment as a matter of law on Counts I and II of the amended complaint and, insofar as it seeks relief against defendants Belting, Vogel, and Heim, on Count IX of the amended complaint. The defendants are entitled to judgment as a matter of law

on Counts III and X of the amended complaint.

### B. Mr. Van Otterloo

It remains to determine whether Mr. Van Otterloo, like Messrs. Belting and Vogel and Mrs. Heim, violated ERISA via the solicitation and abstention decisions. Mr. Van Otterloo was not a Committee member; he had no official vote on the issue. The plaintiffs contend that he nonetheless assumed and violated a fiduciary duty under ERISA. Two counts of the plaintiffs' amended complaint address Mr. Van Otterloo's individual role in the decisions with respect to the voting at the 1989 shareholders' meeting:

Count IV alleges that Mr. Van Otterloo violated his own fiduciary duty under 29 U.S.C. § 1104(a)(1)(A) and (D) and knowingly participated in the committee defendants' breaches of their fiduciary duties, in violation of 29 U.S.C. § 1105(a)(1); and

Count X alleges that Mr. Van Otterloo violated 29 U.S.C. § 1106(a)(1)(D) and (b)(1) by directing the Committee defendants' use of plan assets for the benefit of parties in interest through their decisions with respect to the shareholders' meeting.

█ One is a fiduciary with respect to an ERISA plan if "he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets". 29 U.S.C. § 1002(21)(A)(i). One who exercises authority over a plan properly can be held to be a fiduciary under ERISA. *Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir.1988); *Donovan v. Mercer*, 747 F.2d 304, 308 (5th Cir.1984). The plaintiffs argue that Mr. Van Otterloo imposed his decision concerning solicitation and abstention on the Committee, thus acting as fiduciary for purposes of ERISA. He did not do so with an "eye single" to the beneficiary's interests, the plaintiffs contend, and thus breached that fiduciary duty.

Mr. Van Otterloo disputes the plaintiffs' underlying factual assertion. He contends that while he suggested that the ESOP's votes be abstained in 1988, he did not so direct, and indeed did not even so suggest, in 1989. Accordingly, he maintains, he did not exercise the sort of control over the ESOP necessary to create a fiduciary obligation under 29 U.S.C. § 1002(21)(A)(i).

Whether Mr. Van Otterloo exercised authority or control over the decision to direct abstention at the 1989 meeting presents a factual issue. On November 14, 1988, Mr. Van Otterloo sent a memorandum to the ESOP Committee (then comprised of Mr. Belting, Mr. Vogel, and three others):

I recommend that in fairness to all shareholders, and to avoid frivolous litigation, that you should instruct the ESOP Trustee to vote only the vested (owned) shares of the ESOP members as reported by Price Waterhouse.

The unallocated and other unvoted shares should be cast as abstentions.

In the normal course of events, I believe the ESOP Committee should instruct the Trustee to vote only vested shares.

Three days later, the Committee met and, after noting Mr. Van Otterloo's memorandum, voted 4–1 to follow the course recommended by Mr. Van Otterloo with respect to the 1988 shareholders' meeting.

On October 31, 1989, the Committee (now consisting of the five members outlined at the outset of this opinion) met to determine how to cast the Plan's votes. The minutes of that meeting indicate that Mr. Belting explained the past methods used to cast non-voting, unallocated, and non-vested shares. In the ensuing discussion, Mr. Belting stated his preference for the 1988 method of instruction, because that method avoids interpretation of the results of shares cast by a partial group to that of the total shares held by the Trustee. Mr. Newton believed that the shares should be allocated on the basis of the percentages of the votes cast. By a 3–2 vote, with Mr. Newton and Mr. Stanton dissenting, the Committee opted for the 1988 method, which entailed abstention.

The plaintiffs point to a single document in support of their contention that Mr. Van Otterloo exercised control or authority over

the abstention decision. In a November 13, 1989 letter to the Trustee, Mr. Belting wrote, "The ESOP Committee was directed to adopt the policy of instructing the Trustee to vote shares held in trust in the same totals as the eligible participants had voted their vested shares 'for' or 'against', and to cast all non-voting, unallocated, and nonvested shares as 'abstained'."

 Mr. Belting's letter creates a genuine issue of fact as to whether Mr. Van Otterloo directed the abstention of shares during the 1989 shareholders' meeting. He reports that the Committee "was directed to adopt" that policy. Although he did not identify the source of that direction, the chain of command permits a reasonable inference that the direction came from Mr. Van Otterloo.

Mr. Belting's letter does not, however, rise to the level of proof necessary to warrant summary judgment against Mr. Van Otterloo. Fiduciary obligations under 29 U.S.C. § 1002(21)(A)(i) originate from the acts of the purported fiduciary and are not bestowed by others. The plaintiffs have offered no case in which an actor was found to be an ERISA fiduciary solely on the strength of the perceptions of others with whom the actor dealt. In *Brock v. Hendershott*, 840 F.2d at 343, a union official was found to be an ERISA fiduciary not only because of the considerable influence he wielded over local unions, but also because he used that influence to direct the activities of the locals, including the assumption of bargaining tasks for one local. Thus, Mr. Van Otterloo's liability as a fiduciary for the decision to abstain the Plan's votes at the 1989 shareholders' meeting depends on what he said and did and not solely upon how Mr. Belting perceived his options.

The fact issue is not material, however. A disputed fact is material, and thus precludes summary judgment, only if it is outcome-determinative. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989). Because there is no genuine factual dispute concerning Mr. Van Otterloo's actions toward solicitation, the factual dispute concerning his role in the abstention determination is not material.

 Mr. Belting directed the dispatch of proxy solicitations to plan participants. Prior to any Committee discussion, he directed that no solicitation be made of retired employees; his direction was ratified at a subsequent Committee meeting. In his deposition, he testified that he discussed the issue with Mr. Van Otterloo, who agreed with him that proxies should not be solicited from retired employees. Mr. Van Otterloo testified that he told Mr. Belting, "we should not be soliciting. If you did send him a ballot, you should not have." Mr. Belting testified to Mr. Van Otterloo's impact:

Q And so at least as of the time proxies were sent out, if Mr. Van Otterloo had said, "Send them out to retirees," they would have been sent out to retirees? But Mr. Van Otterloo having said, "Don't send them to retirees," you didn't send them to retirees; is that fair?

A That's fair.

Mr. Van Otterloo's own undisputed acts and words, together with their impact on Mr. Belting in light of the SBL chain of command, constituted the exercise of authority and control over the management of the ESOP's assets. Mr. Belting made the final decision, but Mr. Van Otterloo exercised authority and control over that decision. Accordingly, Mr. Van Otterloo, whose presence on the ballot at the shareholders' meeting made his divided loyalty even more evident than that of the Committee members, owed ESOP participants the fiduciary obligation to engage in "an intensive and scrupulous independent investigation" of his options to insure that he acted in the beneficiaries' best interests. *Leigh v. Engle*, 727 F.2d at 125–126. He did not do so.

Because Mr. Van Otterloo exercised authority and control over the Committee's ultimate decision not to solicit proxies from retired plan participants, and did not comport with the fiduciary obligation of one who does so with divided loyalties, summary judgment is appropriate for the plain-

tiffs against Mr. Van Otterloo in his individual capacity on the claim that he undertook and violated fiduciary duty. Because the court has found that Mr. Van Otterloo violated § 1104, the court need not decide whether he also violated § 1106.

The plaintiffs have demonstrated themselves to be entitled to judgment against defendant Van Otterloo as a matter of law on Count IV of the amended complaint. Judgment shall be entered for defendant Van Otterloo on Count X of the amended complaint.

### C. The Board Defendants

The plaintiffs claim that SBL Board members Van Otterloo, Carr, Gallaher, and Fedder breached their fiduciary duties by failing to ensure that the Committee members they appointed were capable of acting independently. Count V of the amended complaint alleges that the Board defendants violated their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A) and (B) and their duties as cofiduciaries under 29 U.S.C. § 1105(a). Count IX alleges that the Board defendants breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A), (B), and (D) by engaging in a course of conduct intended to consolidate the positions of Mr. Van Otterloo and his allies.

■■■ The power to appoint and remove plan fiduciaries makes fiduciaries of a board and its members, requiring adherence to the standards of 29 U.S.C. § 1104. *Leigh v. Engle,* 727 F.2d at 1334–134; *O'Neill v. Davis,* 721 F.Supp. at 1016; *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 640 (W.D.Wis.1979). This fiduciary duty entails the obligation of appropriate monitoring of the administrators' actions. *Leigh v. Engle,* 727 F.2d at 135. The SBL Board of Directors has such appointive authority under § 18 of the plan documents.

The defendants respond again with the contention that SBL's interests were identical with those of the ESOP participants and with the empty argument that the Committee defendants had the Plan participants' interest closer to their hearts than did Mr. Newton and his union.

The plaintiffs support their argument with nothing of record apart from their contention that the Committee members had an inherent, irreconcilable conflict of interest by virtue of their allegiance to their superiors at SBL. As noted before, ERISA specifically allows a party in interest's officer or employee to serve as a fiduciary. 29 U.S.C. § 1108(c)(3). This permission is hollow if an appointing entity is said to have breached its fiduciary obligation merely by appointing an officer or employee to the committee administering the plan.

The plaintiffs point to nothing that could be deemed to have put the Board members on notice of possible misadventure by their appointees. Section 8 of the plan documents specifically states that the ESOP need not solicit proxies from retired employees; abstention of votes is permissible.

The plaintiffs have failed to come forward with evidence sufficient to withstand a directed verdict motion on their claims against the Board defendants concerning the shareholders' meeting decisions. The Board defendants are entitled to summary judgment on Count V of the amended complaint.

### D. The Voting Trustee

Count XIII of the plaintiffs' amended complaint alleges that 1st Source Bank violated 29 U.S.C. §§ 1104(a) and 1105(a) by giving effect to the Committee's voting instruction. A custodial trustee ordinarily is bound to carry out instructions from a plan's named fiduciaries, but only if the instructions are proper and are not contrary to ERISA. 29 U.S.C. § 1103(a)(1). The plaintiffs appear to argue that the Committee's instruction that 1st Source abstain seven of every ten ESOP-held shares was so unusual that 1st Source should not have followed it. The instruction was sufficiently irregular that 1st Source questioned it.

■■■ As discussed in Part II–A, however, a decision to abstain its voting shares was within the Committee's discretion; and the plan documents specifically freed the Committee of any obligation to solicit proxies from retirees. Had the Committee

members with divided loyalties (a group that probably includes all Committee members, including plaintiffs Newton and Stanton) procured the necessary independent investigation of their options, the instruction would not have run afoul of ERISA. Nothing in the record before the court would charge 1st Source with knowledge of the Committee members' failure to engage in such an investigation.

Because 1st Source could not have known of the Committee members' breaches of fiduciary duty, it was bound by § 8 of the plan document and by 29 U.S.C. § 1103(a)(1) to follow the instruction, and it did so. The plaintiffs have presented no basis upon which 1st Source could be held liable for a violation of ERISA. 1st Source is entitled to judgment on Count XIII of the amended complaint as a matter of law.

### III. The Contribution and the Fund Payment

The plaintiffs also claim that the Committee violated its fiduciary duty to the participants by failing to enforce SBL's obligation to pay it the amount required for the Plan to make its 1989 loan payment to the Industrial Revolving Fund. This resulted in the Fund seeking foreclosure of the ESOP-held shares and, eventually, in an agreement restructuring the debt.

As noted at the outset of this opinion, the ESOP was created in 1975 through a loan of more than $5 million from the Fund, which allowed the ESOP to purchase all capital stock of what became SBL. That stock serves as collateral for the loan. SBL makes annual contributions to the ESOP, which the ESOP uses to make its installment payments on the loan.

One such payment, in the sum of $314,-582.00, was due to the Fund on June 30, 1989. The SBL Board, although obligated to make a payment to the ESOP of not less than the amount due the Fund, decided to make only a $130,000.00 payment to the ESOP, due to SBL's financial condition. Mr. Belting concurred in that decision. Not even that amount was paid; SBL ultimately contributed $3,000.00 to the ESOP for 1989. As a result, the ESOP could not make its loan payment to the Fund. The Fund brought suit against the ESOP in an Indiana court, seeking to accelerate the ESOP's loan payments and recover from the ESOP a sum in excess of $3.2 million. The Fund also filed an involuntary bankruptcy proceeding against SBL.

Settlement discussions were fruitful. The bankruptcy court dismissed the action before it. The state court action was dismissed pursuant to a stipulation under which the Fund forgave $2.1 million of the $3.7 million debt then owing, with the remaining $1.6 million payable in full in 1992. The settlement increased the equity of SBL by $2.1 million. The success of the settlement surprised even the union.

Count VI of the plaintiffs' amended complaint alleges that SBL breached its contractual obligation by failing to make its annual contribution that permits the ESOP to make its loan payment to the Fund. Count VII alleges that the Board defendants (Van Otterloo, Carr, Gallaher, and Fedder) violated their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A) and (B) and their duties as co-fiduciaries under 29 U.S.C. § 1105(a) by failing to appoint ESOP Committee members who would enforce SBL's obligation to make its annual contribution to the ESOP. Count VIII alleges that the Committee defendants breached their fiduciary duties under 29 U.S.C. § 1104(a)(1)(A), (B), and (D) by their failure to enforce SBL's contractual obligation to make the annual contribution to the ESOP.

The plaintiffs raise much the same argument as with respect to the decisions concerning the shareholders meeting, arguing again that the defendants' conflicting loyalties required a heightened investigation to meet their fiduciary duties. But while a sufficient divergence of serving present management and of serving ESOP beneficiaries warranted application of the test of *Leigh v. Engle,* 727 F.2d 113, to the decisions concerning the shareholders' meeting, no such divergence of interests is shown with respect to the decision concerning payment to the ESOP and, ultimately, to the Fund.

As noted before, virtually all the ESOP owns is SBL stock. SBL's failure would affect the ESOP adversely and dramatically. As noted in the previous section, the ESOP's interests may not be wholly aligned with Committee members' perceptions of whether their present superiors should be retained at SBL's helm, but the plaintiffs have presented no cogent argument why, the identities of leaders aside, the symbiotic relationship between SBL and its ESOP could help but produce inseparable interests in the continued financial success of SBL.

The defendants do not dispute that their strategy entailed risk, and the plaintiffs rely on that risk in asserting their ERISA claim, citing *Leigh v. Engle.* But neither that case nor ERISA prohibit the taking of any risk by an ERISA fiduciary; such a prohibition would preclude any investment apart from government bonds, and so impair the appreciation of a plan's assets. If plan assets are risked in whole or in part for the fiduciary's separate purpose, the heightened examination dictated by *Leigh v. Engle* applies, 727 F.2d at 122, but the plaintiffs have shown no separate purpose here.

Of course, even a fiduciary with undivided loyalties may take a risk so great it would violate the "prudent man" standard of 29 U.S.C. § 1104(a)(1)(B) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"). Such imprudent conduct violates ERISA whether the imprudence is dishonest, *Katsaros v. Cody,* 744 F.2d 270 (2nd Cir.1984), or innocent, *Brock v. Robbins,* 830 F.2d 640 (7th Cir.1987), because "imprudent trustees undermine the purpose of ERISA which is to insure that the assets of a fund will be there when the beneficiaries need them." *Brock v. Robbins,* 830 F.2d at 647.

The plaintiffs have made so showing that the defendants' actions were imprudent. At the time the decision was made, projections indicated that SBL would be out of cash by the end of December, 1989 due to established or projected needs for goods and materials. The defendants considered the possibility that default on the payment would result in foreclosure of all 5,116 shares of stock held as collateral, but two attorneys had advised that the Fund could foreclose on no more than 427 shares, then worth $43.00 per share. The plaintiffs note the same risk of losing all shares rather than only 427 shares, but offer no explanation as to why the attorneys advising SBL were wrong.

Even with only 427 shares at risk, the defendants' risk exceeded $18,000.00 in value. While this risk is not insignificant, the plaintiffs have not shown why it was imprudent. They have offered no alternative courses the defendants should have taken; they have offered no suggestion of what additional investigation would have shown. The defendants' conduct meets even the elevated test of prudence set forth in *McMahon v. McDowell,* 794 F.2d 100, 112 (3rd Cir.1986).

 The court need not determine whether, as the plaintiffs contend, the defendants' investigation of their options would have sufficed under the standards of *Leigh v. Engle,* because those standards are triggered only by the fiduciaries' divided loyalties. Neither divided loyalties nor imprudence have been shown. Summary judgment is appropriate absent such proof. *DeBruyne v. Equitable Life Assurance Soc'y,* 920 F.2d 457, 464–66 (7th Cir.1990). The defendants are entitled to judgment as a matter of law on Counts VI, VII, and VIII of the plaintiffs' amended complaint.

### IV. Mr. Newton's Removal

Count XII of the plaintiffs' amended complaint alleges that the Board defendants violated their fiduciary duty under 29 U.S.C. § 1104(a)(1)(A) and engaged in retaliatory discrimination under 29 U.S.C. § 1132(a)(3) when they removed Mr. Newton from the Committee. Mr. Newton

sought a preliminary injunction restoring him to his position on the Committee. The court denied that motion; that ruling apparently is presently on appeal. Because this motion has been more than three months under advisement, this court must proceed with a ruling on the merits without interlocutory appellate guidance. The parties have submitted no additional facts or argument; accordingly, the court relies upon its earlier ruling.

Mr. Newton, with his fellow plaintiffs, filed this suit on December 29, 1989. In February, 1990, the SBL Board removed him from the ESOP Committee. When he asked why he was removed, he was told it was because he had become an adversary by filing the suit. The plaintiffs maintain that the Board's action breached the directors' fiduciary duty to the ESOP participants and beneficiaries, 29 U.S.C. § 1104(a)(1), and also breached the anti-retaliatory provisions of 29 U.S.C. § 1140. The two theories intertwine and are best analyzed together.

The plaintiffs argue that Mr. Newton's removal was done not with eye toward the beneficiaries' interest, but rather in response to his participation in this suit. He had demonstrated no inability to perform his duties as a Committee member or provided any cause to question his qualifications; he simply filed a lawsuit he perceived to be required by his own fiduciary obligation.

The Board defendants respond that they need no reason to remove a Committee member, so even the absence of any good reason for removal cannot support an inference that the removal offended their fiduciary duties. Even so, the Board defendants claim that the filing of suit rendered Mr. Newton an adversary whose removal was needed to preserve the attorney-client privilege, providing ample reason to remove him.

The plaintiffs explain further that their contention is not that Mr. Newton was removed for no reason; it is that he was removed for an unlawful reason. ERISA's anti-retaliation clause, 29 U.S.C. § 1140, makes it unlawful "to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under" a plan or ERISA. Mr. Newton is a participant and had a right to bring suit under 29 U.S.C. § 1132(a)(3); accordingly, the plaintiffs argue that Mr. Newton's removal constitutes an act of discrimination for exercising the right to bring suit.

■■■ Mr. Newton's removal was "retaliatory" in the sense that he was removed from the Committee because he filed a lawsuit, and he had an ERISA-created right to file this suit. 29 U.S.C. § 1140, however, speaks in terms of "discrimination" rather than "retaliation". No reported case addresses whether the removal of an ESOP Committee member from his appointed, unpaid position constitutes "discrimination" forbidden by § 1140. After a review of the reasoning of analogous cases, the court concludes that a showing of economic injury, actual or constructive loss of employment, or threat of violence is necessary to constitute an act of "discrimination" under § 1140.

In *West v. Butler*, 621 F.2d 240 (6th Cir.1980), the court, relying exclusively on legislative history, held that violent secondary picketing designed to interfere with welfare and pension rights did not violate § 1140. The court first noted S.Rep. No. 93–127, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News, at 4838, 4872:

> These provisions [29 U.S.C. §§ 1140 and 1141] were added by the Committee in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of economic sanctions or violent reprisals. Although the instances of these occurrences are relatively small in number, the Committee has concluded that safeguards are required to preclude this type of abuse from being carried out and in order to completely secure the rights and expectations brought into being by this landmark reform legislation.

The court next noted Senator Hartke's remarks, reported at 119 Cong.Rec. 30374:

Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforceable under section 301 of the Labor–Management Relations Act. But roughly half of all pension participants are not unionized and so they lack protection. Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge before vesting.... Discipline and discrimination can be so unpleasant as to amount to constructive discharge, a term used by the National Labor Relations Board. That can be the type of harassment which does not say that one is fired, but makes living such a hell that a person wishes he did not have to hang on and endure.

621 F.2d at 245. From these passages, the *West* court concluded, "the prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights", 621 F.2d at 245, and that "discrimination, to violate [§ 1140] must affect the individual's employment relationship in some substantial way." 621 F.2d at 245–246. Senator Hartke's remarks harkened to § 8(a)(3) of the National Labor Relations Act, which refers to discrimination "in regard to hire or tenure of employment or any term or condition of employment". 621 F.2d at 245 n. 4

Other courts have concurred with the Sixth Circuit's reading of § 1140. In *Young v. Standard Oil (Indiana)*, 660 F.Supp. 587, 597 (S.D.Ind.1987), *aff'd*, 849 F.2d 1039 (7th Cir.), *cert. denied*, 488 U.S. 981, 109 S.Ct. 529, 102 L.Ed.2d 561 (1988), the court held that the plaintiffs had shown no discrimination in the nature of a constructive discharge and so granted summary judgment to the defendants on the § 1140 claims. *See also Paul v. Valley Truck Parts, Inc.*, No. 88 C 7131, 1990 WL 139045 (N.D.Ill. Sept. 18, 1990) (LEXIS, Genfed library, Dist file).

The Sixth Circuit did not overlook the potential application of § 1140 in other contexts. It noted only the primary, not the exclusive, purpose of § 1140. 621 F.2d at 245. The court's cautious use of the qualifier, "primarily", is appropriate; § 1140 is not limited to loss of employment rights. Retaliatory curtailment of benefits under an ERISA plan may trigger § 1140, *see Gavalik v. Continental Can Co.*, 812 F.2d 834, 857–858 (3rd Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Vogel v. Independence Federal Savings Bank*, 692 F.Supp. 587 (D.Md. 1988), *later opinion on summary judgment*, 728 F.Supp. 1210, 1225–1226 (D.Md. 1990); *Greenblatt v. Budd Co.*, 666 F.Supp. 735 (E.D.Pa.1987); *see also Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2nd Cir.1988) (discharge to defeat pension rights); *Nemeth v. Clark Equipment Co.*, 677 F.Supp. 899 (W.D.Mich.1987) (plant closing to reduce pension exposure), although courts disagree as to who may be sued for such violations. *Rollo v. Maxicare of Louisiana*, 698 F.Supp. 111 (E.D. La.1988). *But see Deeming v. American Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir.1990) ("a fundamental prerequisite to a [§ 1140] action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way"). Similarly, demoting and requiring an employee to work in degrading conditions to coerce a pre-vesting resignation offends § 1140. *Jess v. Pandick, Inc.*, 699 F.Supp. 698 (N.D.Ill.1988). These cases, however, do not affect the basic holding of *West* that § 1140 does not reach retaliatory action that affects neither the terms nor conditions of employment nor rights under the plan.

In *McGinnis v. Joyce*, 507 F.Supp. 654, 657 (N.D.Ill.1981) (Shadur, J.), the plaintiff alleged that the defendants had violated § 1140 by threatening him with violence should he continue with his lawsuit; the court held that such an allegation stated a claim upon which relief could be granted. Although the *McGinnis* scenario differs from the cases discussed above, its holding is consistent with *West*, which relied on a senate report that indicated that § 1140

was intended to apply to threats of violent reprisals.

In *Sheet Metal Workers Int'l Ass'n v. Lynn*, 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), the Court held that Title I of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.*, protected an elected union official from removal by a trustee on account of his exercise of protected membership rights. The holding in *Lynn*, however, was grounded on the plaintiff's status as an elected official: "[W]hen an elected official like Lynn is removed from his post, the union members are denied the representative of their choice. Indeed, Lynn's removal deprived the membership of his leadership, knowledge and advice at a critical time for the Local." 488 U.S. at 355. The concept of "representation" ill-suits the ERISA-based fiduciary duty to all beneficiaries and finds no base in the plan under which the SBL ESOP Committee was created.

Based on the foregoing, the court concludes that discrimination for purposes of § 1140 must include some threat of violent reprisal or, like discrimination under § 8(a)(3) of the National Labor Relations Act, must relate to hire or tenure of employment or any term or condition or to the continuation of benefits under the ERISA plan. The retaliation against Mr. Newton falls within none of these categories. Removal from the Committee wrought no change in his employment rights, his pay, his shift, his hours, his working conditions, or his rights under the plan. No violence was threatened or used. His removal did not violate 29 U.S.C. § 1140.

The plaintiff's contention that the Board defendants violated their fiduciary duties rests upon the proposition that Mr. Newton was removed for a reason unlawful under § 1140. The reason for removal was not unlawful. Nothing remaining in the record supports an inference that his removal constituted a breach of the Board defendants' fiduciary duty.

Accordingly, the Board defendants are entitled to judgment as a matter of law on Count XII of the plaintiffs' amended complaint.

### V. Conclusion

For the foregoing reasons, the court now GRANTS defendant 1st Source Bank's summary judgment motion and GRANTS IN PART AND DENIES IN PART the summary judgment motions filed by the plaintiffs and by the remaining defendants. The plaintiffs' motion is granted as to Counts I, II, and IV of the amended complaint and as to Count IX insofar as it seeks judgment against defendants Belting, Vogel, and Heim. The plaintiffs' motion is denied in all other respects. The remaining defendants' motion is granted as to Counts III, V, VI, VII, VIII, and X of the amended complaint and as to Count IX insofar as it seeks judgment against defendants Van Otterloo, Carr, Gallaher, and Fedder.

In a separate order to be issued shortly, the court will schedule a conference to address the procedure by which the relief to which the plaintiffs are entitled will be determined.

SO ORDERED.